CASE 38—INDICTMENT—DECEMBER 8.

Jackson v. Commonwealth.

APPEAL FROM CAMPBELL CIRCUIT COURT.

1. CRIMINAL LAW—PRACTICE IN COURT OF APPEALS.—In a criminal case, the Court of Appeals, under the express language of the law is not authorized to examine the testimony, but is confined exclu-sively to a review of the errors of law, appearing of record, and to only such of them as affect the substantial rights of the ac-cused.

   In this case, the facts in evidence conduce to establish the guilt of the accused.

2. JOINT INDICTMENT IN THE ALTERNATIVE—SUFFICIENCY OF.—A joint indictment against two persons charging that they "on the ......day of .........., 1896, before the finding of this indict-ment, in the county aforesaid, did willfully, feloniously and with

malice aforethought, kill and murder Pearl Bryan, by the one or the other, * * * with a knife or other sharp instrument, cutting the throat of the said Pearl Bryan, so that she did then and there die, the other being then and there present, aiding and abeting the same, the exact manner whereof is unknown to the grand jurors; and which did the cutting * * * * or which aided and abetted the same, is unknown to the jurors," is sufficiently direct and certain as to the party charged; they each being charged with the murder, either by the cutting, or by aiding or abetting the other. It is the mode or means of committing the crime which is charged in the alternative (which may be done), and not as to who committed it.

3. SHERIFF—SUBSTITUTION OF SOME ONE TO PERFORM DUTIES OF— AFFIDAVIT FOR.—The court properly refused to relieve the sheriff of his duties in connection with the trial of the case upon the filing of defendant's affidavit stating that that officer had taken an unusual and remarkable interest in bringing about his conviction, and had frequently denounced him and his co-defendant as the guilty parties, and devoted his whole time to hunting up evidence against him, and had endeavored by threats of punishment to force him to confess the crime; it not appearing that the sheriff had any personal feeling or bias against defendant, or that he failed to execute all process placed in his hands by defendant, and it not even appearing from the record that the sheriff or any of his deputies summoned any juror in the case.

4. PUBLIC TRIAL—TICKET SYSTEM.—The court properly disregarded a motion of the defendant, made before the commencement of the trial, to direct the sheriff to allow all well-behaved persons to attend the trial so long as they could be accommodated, the motion being accompanied with an affidavit that the sheriff had announced his intention of permitting no one to enter the court room during the trial, except members of the bar and court officers, who did not hold tickets of admission issued by him. This action was not prejudicial to appellant's substantial rights, it not appearing that any of his friends, or other person who desired to do so, were prevented from attending the trial; and it appearing that the ticket system was not carried out, or the tickets issued otherwise than to those who first applied for them, and this being done under the eye of the trial judge, and for the sole purpose of preventing an overcrowding of the court room.

Jackson v. Commonwealth.

5. CIRCUMSTANTIAL EVIDENCE.—When the solution of a mysterious case rests largely, not only upon direct testimony explaining the immediate transaction, but upon circumstances affecting, or supposed to affect, the main transaction, the evidence should be allowed to take a wide range. Evidence in this case that the deceased was carrying a five months' foetus, which was probably alive up to the time of her death, is competent, although no mention was made in the indictment of the murder of an unborn child, because it furnishes a motive for the killing.

6. EVIDENCE—CONVERSATION BETWEEN ACCUSED AND HIS ACCOMPLICE.—Upon the trial of one of two persons jointly indicted, evidence detailing a conversation between them after their arrest —the statements in which were not procured by promises or threats—were competent against him as to his own statements; and it appearing that his statements alone, without the corresponding portions of the conversation as made up by the other's statements, would be unintelligible, the whole must be taken in order to get the sense of it.

7. EVIDENCE.—Cocaine having been found in the stomach of the deceased, and the accused having previously inquired into its effects on the system, the statement of a witness as to the use of this drug in abortions, and its effects upon the system, were properly admitted in evidence.

8. EVIDENCE—ACTS OF ACCOMPLICE.—The various acts of the accomplice during the week preceding the commission of the crime, with which the accused was shown to be closely connected, were competent.

9. EVIDENCE.—Voluntary conversations between accused and his accomplice while confined in jail, are competent.

10. PRACTICE.—A witness whose deposition has been taken and read in evidence by the defense, may afterwards be introduced in person by the State.

11. INSTRUCTIONS.—An instruction authorizing the jury to find the defendant guilty of murder if they believe beyond a reasonable doubt that he "willfully, feloniously, and with malice aforethought himself attempted, or aided or abetted or procured another to attempt to kill Pearl Bryan, but she was not thereby killed, and that said defendant in this county and State * * * though believing said Pearl Bryan was then dead, for whatever purpose, cut her throat with a knife or other sharp instrument, so that she did then and there, and because thereof die," was

proper, the evidence conducing to show that an attempt was made to kill the girl by the administration of cocaine, while in Cincinnati, and that this was done by the defendant, or at his instance, but that sne was not thereby killed.

12. INSTRUCTIONS.—An instruction authorizing the jury to find the defendant guilty of murder if they believed that he feloniously administered, or procured another to administer drugs to Pearl Bryan for the purpose of producing an abortion when she was so far gone with child as to make it necessarily dangerous to her life, or when the drugs were in themselves or in the manner administered dangerous to her life; and though believing her to have been killed in this way, he cut her head off in Campbell county when she was in fact alive, embodies correct principles of law; and this instruction is fairly suggested by the proof, considering the purpose for which the girl was brought to Cincinnati, the fact that cocaine was found in her stomach, and defendant's inquiries with respect thereto.

13. INSTRUCTIONS—MANSLAUGHTER.—An instruction authorizing the jury to find the defendant guilty only of manslaughter if he cut the throat of Pearl Bryan in Campbell county under the belief that she was already dead, and not intending to kill her but merely for the purpose of concealing her identity, unless they should further believe that he had theretofore attempted to kill her, or procured another to so attempt, or had administered drugs or procured another to do so, for the purpose of producing an abortion, in which event they would find him guilty of murder, was proper.

14. CIRCUMSTANTIAL EVIDENCE—REFERENCES IN ARGUMENT TO CELEBRATED CASES OF.—References in argument to celebrated cases of circumstantial evidence, which are merely historical illusions to such cases, are not improper, and furnish no ground for reversal.

15. JURISDICTION—COMPLETION OF CRIME ATTEMPTED IN ANOTHER SOVEREIGNTY.—An attempt to commit a murder in another State, supposed by the guilty party to have been there successful, but in reality completed in this State, though by an act not by him believed to be the consummation of his purpose, is punishable in this State.

16. INDICTMENT—INSTRUCTIONS—VARIANCE.—Although the indictment charged murder by cutting the throat or decapitation, the jury, under the instructions, was properly permitted to consider a previous attempt to kill in another State, and by different means.

The jury may consider the motive which inspired the attempted crime in another sovereignty, and the circumstances of the at-tempt, with the view to determine the character of the ultimate fact which took place in this sovereignty.

L. J. CRAWFORD FOR APPELLANT.

1. The indictment must be direct and certain as to the party charged and offense charged.   (Criminal Code, secs. 124 and 126.)

2. Upon the filing of an affidavit by one charged with murder that the acting sheriff is prejudiced against him, and interested in having him convicted, the court should have designated some other officer or person to summon the petit jury.   (Criminal Code, sec. 193; Civil Code, 667.)

3. The appellant was not accorded his constitutional right of a pub-lic trial of the charges against him.  The court allowed the sheriff, who was prejudiced against appellant, to issue tickets of admission, and no one without a ticket was permitted to go in-side the court house, thus giving the sheriff power to say who should and who should not attend the trial, and to pack the court house with people hostile to the accused.  (Constitution, secs. 11 and 14; People v. Murray, vol. 14, Criminal Law Magazine and Reporter, p. 405.)

4. The court erred in allowing Judge Caldwell, upon direct examina-tion, to detail statements damaging to appellant, made by Wall-ing, appellant's co-defendant in the joint indictment.  Walling could not have been introduced by the State against appellant, therefore statements made by him (Walling) to a third party, in the presence of appellant were clearly incompetent.  The injury was not cured by the judge telling the jury not to consider it.  (Criminal Code, sec. 234; Downard v. Com'lth, 13 Ky. L. R., 472; People v. Elster, 5 Crim. Law Mag. and Rep., 687; Greenleaf on Evidence, vol. 1, sec. 363; Cargill v. Com'lth, 12 Ky. L. R., 149; Montgomery v. Com'lth, 17 Ky. L. R., 94.)

5. The court should have defined manslaughter, and should have also given an instruction on the law of self-defense.   (Rutherford v. Com'lth, 13 Bush, 608; Rochford v. Com'lth, 16 Ky. L. R., 411.)

6. When an attorney for the Commonwealth says or does what is unauthorized, improper or to the prejudice of the rights of the defendant, it is the court's duty to stop him, and to direct the jury to disregard it in making up their verdict.  (Smith v. Com.,

Jackson v. Commonwealth.

9 Ky. L. R., 217; Cook v. Com., 9 Ky. L. R., 830; Cupp v. Com., 9 Ky. L. R., 880; Hilton v. Com., 13 Ky. L. R., 160; Duncan v. Com.,13 Ky. L. R., 196; Petty v. Com., 12 Ky. L. R., 921; Conn. v. State, 11 Texas Ct. App., 390; Tucker v. Henniker, 41 N. H., 317; People v. Wells, 100 Cal., 459; People v. Mullins, 83 Cal., 138; O'Brien, Jr., v. Com., 11 Ky. L. R., 537.)

L. J. CRAWFORD IN PETITION FOR REHEARING.

1. Where a trial lasts through several days, one whose attendance upon the trial is limited to one-half of a daily session, can form no idea of the fairness or propriety of the trial. The constitutional purpose of an open, public trial is to permit the public to be present in order that the triors may be kept keenly alive to a sense of their responsibility and the importance of their functions, and this purpose is defeated by permitting one to be present at the trial only a small part of the time during which the trial progressed. (People v. Murray, 14 Lawyer's Rep. Ann., 809.) .

2. The evidence as to other offenses alleged to have been committed by appellant, was incompetent.

3. The fact that appellant at the time denied the accusations of Walling, should not have the effect to make them competent evidence when they would not otherwise have been. The effect of this would be to punish the appellant for making the denial.

W. S. TAYLOR AND M. R. LOCKHART FOR APPELLEE.

1. In a case where the commission of the crime can only be shown by a proof of circumstances, the evidence should be allowed to take a wide range. (O'Brien v. Com., 11 Ky. L. R., 537.)

2. A *confession* is an admission of guilt, meant to be inculpatory, and a mere *admission denotes* the acknowledgment of any fact not so meant. There was no confession in this case, because appellant denied his guilt, but he admitted certain facts, which were competent to be shown as admissions. (Bishop's New Crim. Pro., p. 1217 and vol. 1, sec. 1247, subsec. 3; Com. v. Kenney, 53 Mass.)

3. The adoption of the so-called "ticket system" did not operate to deny the appellant a public trial. Nothing appears to show that any friend of appellant who applied for it was refused a ticket of admission; and it appears that the court room was crowded at all times during the trial.

4. The fact that a healthy foetus was found upon examination of
the dead girl was relevant and competent, although it is not men-
tioned in the indictment, because it is shown that the very pur-
pose for which the girl had come to Cincinnati was to relieve
herself of it, and besides the fact that there was such a foetus
furnishes a motive for the commission of the crime.

5. The evidence as to what was overheard between Jackson and
Walling while they were in the "sensitive cell" was competent.
It does not affect the competency of such evidence that it was
procured by deception practiced upon the accused. (Wigginton
v. Com., 13 Ky. L. R., 641.)

JUDGE HAZELRIGG DELIVERED THE OPINION OF THE COURT.

The appellant was jointly indicted with one Alonzo
Walling in the Campbell Circuit Court for the murder
of Pearl Bryan, and on his separate trial was found
guilty and sentenced to be hanged.

It will be necessary to submit only a brief summary
of the facts disclosed in the voluminous record before
us to render intelligible the various complaints urged
on this appeal against the judgment of conviction.

On the morning of Saturday, February 1, 1896, the
headless body of a woman was found on the farm of one
Locke, near Newport, in Campbell county. Every
effort to find the head proved futile, but the shoes the
dead girl wore were marked ":Lewis & Hayes, Green-
castle, Indiana," and this circumstance led to the iden-
tification of the body as that of Pearl Bryan, a young
girl of that city. Her clothes were saturated with
blood, particularly about the neck, and a large quantity
of it was found on the ground near the neck, covering a
circular spot some six or seven inches in diameter, and
also a spot of similar kind some feet away. Extending

near to or over this last named spot there were some privet brushes, the leaves of which were spattered with blood, and drops were discovered pending under the leaves, as though the blood had reached the under side of them by spurting from the neck, which it might do as disclosed by the testimony if the decapitation had taken place or been commenced at the spot near the bushes, and if the victim were alive at the time.

These and other circumstances led the authorities to proceed on the theory that the murder—for such it evidently appeared to be—occurred in Campbell county.

An autopsy disclosed that the girl was pregnant, and a healthy foetus, of some five months development, was found, which, in the opinion of experts, was probably alive, until the death of the mother. The inquiries which led to the identification developed the fact that appellant, Scott Jackson, a dental student at the Ohio Medical College, but who formerly lived at Greencastle, was probably the author of the girl's ruin.

It was established beyond question that Pearl Bryan, after trying without success certain remedies prescribed by the appellant, left home on the Monday preceding her death, ostensibly to go to Indianapolis to visit friends, but in fact to come to Cincinnati in order that appellant might in some way procure relief for her, and it was shown that when she arrived in the city, where she was a stranger, she applied to him, or to him and Walling, the roommate and intimate associate of Jackson, for the purpose indicated.

On several days succeeding her arrival the three,

Jackson, Walling and Pearl Bryan, were seen together in different parts of the city, though where she stayed during this time does not clearly appear.

By one witness, and by only one, does the Commonwealth directly connect the appellant and his associate Walling with the girl at about the time she must have been murdered. This witness, a negro, George H. Jackson, testifies that at about 1 o'clock on the night of Friday, the 31st (or rather the morning of February 1st), he was employed to drive, and did drive, a hack or cab from Cincinnati across to Newport, and out to a point near where the body was subsequently found, and was accompanied by Walling, who rode on the seat with him, and by appellant, who was in the interior of the vehicle with another person whom he could not see, but whom he took to be a woman in distress, etc.

This witness was discredited by proof seriously affecting his reputation for truth and veracity and by other circumstances, though it is fair to say that he appears to be corroborated in some material respects. To discard his testimony entirely is by no means to affect the State's case against the prisoner.

It is shown that on the Wednesday preceding the murder the accused bought some seventeen grains of cocaine, and an analysis of the girl's stomach discloses that cocaine had been administered to her. He is shown to have had possession after the girl's death of the valise belonging to her, on the inside of which were blood stains and in which were also found some strands of hair, believed to have come off her head, from its

color, etc., and also dirt or mud corresponding in microscopical appearance with that where the body was found.

On Jackson's pants, found, however, in Walling's locker, were found blood stains, and on the knee was also found some earth which, under the microscope and by chemical analysis, is found identical with the earth found at the point where the body was discovered. His coat is also found in the sewer, where he admits having thrown it, stained with blood. He is found in possession of her clothing, which he attempted to dispose of. He admits that he attempted to get rid of the valise by throwing it in the river, and by attempting to place it on an outgoing train.

There is produced and he admits writing a letter to his friend and associate, one Wood, in which he asks Wood to write in Pearl's name to her parents from Chicago, or elsewhere, saying she was tired of living at home and was at the place of writing, and concludes with these words: "Get the letter off without a second's delay, and burn this at once. Stick by your old chum, Bill, and I will help you out the same way, or some other way, some time."

The theory of the defense is, and the accused so testified, that Wood was the author of the girl's misfortune, and sent her to Cincinnati, where he had made an arrangement to turn her over to Walling, who was to perform, or had performed, an abortion. Appellant says that he last saw the girl at noon of Wednesday, and affects not to have inquired of Walling thereafter

of the success or failure of the plan, or to have known anything of her whereabouts; that he knew nothing or suspected nothing wrong until while at supper with Walling, on Saturday evening, he read a newspaper account of the finding of a headless body on the Locke farm, and at once had a presentiment that "this was Walling's case." He discovered from Walling's conduct on that occasion, and from what Walling confessed to him, that his suspicion was well founded.

He then became panic-stricken, and attributes to this mental condition his subsequent conduct in helping Walling to dispose of the dead girl's effects and in writing the damaging letter to Wood. All this he testifies was done at the instance of Walling, and while he was under Walling's influence and in the mental condition named.

This recital, without an elaboration of the proof, some of which is wholly at variance with the theory of the defense, serves to show that the facts in evidence conduced to establish the guilt of the accused, and further than this we are not authorized to examine the testimony, being confined exclusively, under the express language of the law, to a review of errors of law appearing of record, and then only when they are such as to affect the substantial rights of the accused.

By his demurrer and motion in arrest of judgment the appellant first raises the question of the sufficiency of the indictment. This instrument is as follows: "The grand jury of Campbell county, in the name and by the authority of the Commonwealth of Kentucky, accuses

Scott Jackson and Alonzo Walling of the crime of murder committed as follows, to-wit: The said Scott Jackson and Alonzo Walling on the — day of————, 1896, before the finding of this indictment, in the county aforesaid, did willfully, feloniously and with malice aforethought, kill and murder Pearl Bryan by the one or the other, the said Scott Jackson or Alonzo Walling, with a knife or other sharp instrument, cutting the throat of the said Pearl Bryan so that she did then and there die, the other being then and there present, aiding and abetting the same, the exact manner whereof is unknown to the grand jurors, and which did the cutting, Scott Jackson or Alonzo Walling, or which aided and abetted the same is unknown to the jurors, against the peace and dignity of the Commonwealth of Kentucky."

It is urged that this indictment is not direct and certain as regards the party charged, but charges in the alternative that one party or the other committed the offense, when it is permissible only to charge in the alternative the different modes or means of committing an offense.

The indictment, however, charges directly and certainly that Jackson did kill and murder Pearl Bryan, first by himself cutting her throat with a knife, or secondly by aiding and abetting Walling in doing so.

The cutting by himself is one mode, and the aiding and abetting Walling whilst he did the cutting is another mode of committing the murder, and these modes and means may be charged in the alternative.

The indictment is sufficient, and its accuracy and conciseness of expression is to be commended.

Prior to the trial the appellant sought to prevent the sheriff of the county from performing his usual duties, and for that purpose filed his affidavit stating that that officer had taken an unusual and remarkable interest in bringing about a conviction of the accused, and had frequently denounced him and his co-defendant, Walling, as the guilty parties, and had devoted his whole time to hunting up evidence against them, and had endeavored by threats of punishment to force the defendants to confess to the crime. The court's refusal to relieve the sheriff furnishes another ground of complaint.

Unquestionably if it should be shown in any case to the satisfaction of the court that a sheriff was a "party" or was "interested" in the proceeding (Civil Code, section 667, and section 151, Criminal Code), then another officer should be designated to execute the process, and so in criminal proceedings "the court may, for sufficient cause, designate some other officer or person than the sheriff to summon petit jurors." Section 193, Criminal Code.

In this case it is not pretended that the sheriff had any personal feeling or bias against the prisoner, or was personally interested in the trial. While the "sufficient cause" named in the law is not defined, this court in Forman v. Commonwealth, 86 Ky., 603, said of a somewhat similar complaint that the unsupported affidavit of a defendant that the officer "was not a suitable person" and was "biased against him" and "would not sum-

mon impartial men to act as jurors" did not furnish sufficient cause for his removal.

It does not appear from the record here, and it was not intimated during the trial, that the sheriff or his deputies failed to execute all process placed in their hands by the accused. As to the jury it does not appear whether any member thereof was summoned by the sheriff or any of his deputies, and certainly there is no evidence in the record that he or they failed to perform properly any duty in this behalf.

In this connection, as it involves the conduct of the sheriff, we notice the complaint with respect to what is termed the ticket system of admission, adopted by the sheriff to control the attendance at the trial.

The affidavit of the accused, filed several days before the trial commenced, was to the effect that Sheriff Plummer "had announced his intention of permitting no one to enter the courtroom upon the trial herein excepting members of the bar and court officials who shall not hold a ticket of admission issued by him, and that such tickets should be good for only one half of a daily session, and that no person shall receive tickets more than once; and that if said Plummer shall be permitted to carry out said program, friends of affiant, and all others who are not favorites of said Plummer, will be denied admission to the courtroom during the trial, and that affiant will thus be denied his right to an open and public trial, free from partiality and favoritism, etc."

Accompanying the paper was a motion that the court direct the sheriff "to permit any and all well-behaved

Jackson v. Commonwealth.

and respectable persons, who desire to attend the trial herein, to do so, so long as such persons can be conveniently accommodated in the courtroom, and to refrain from admitting some and excluding others, merely to gratify his own caprice and at his own pleasure, and to refrain from excluding any person for the sole reason that he may not hold a ticket of admission, etc."

Here is an effort to forestall the action of the sheriff, as well as a charge in advance that the sheriff would prostitute his office out of mere caprice or his own pleasure. The court properly refused to take any notice of the affidavit or motion.

It is significant that when the trial was over the accused was not able to say that any of his friends, or any other person who desired to attend, had been prevented from doing so, but contents himself with filing an affidavit that the ticket system had been carried out during the trial, and the admission of persons regulated thereby.

While much has been said in oral argument and by brief on this alleged error there is not the slightest indication that the ticket system was carried on, and the tickets of admission issued otherwise than to those who first applied for them, and for the sole purpose of preventing an overcrowding of the courtroom. This plan was carried on under the eye of the trial judge, and we quote his ruling on the point when discussing this ground for a new trial: "The fifth ground is stated to be error of law committed in refusing to permit defendant to have an open and public trial, free from favorit-

ism and partiality.' There is absolutely no foundation
for such a statement. There is no suggestion made
that there was the slightest discrimination in the
admission of persons to the courtroom. The court, to
enable it to transact business and as a protection to the
defendant, directed the sheriff to have tickets of admis-
sion to the courtroom limited in numbers to the seating
capacity of the room, and to give them in the order in
which requests were made to him for them; that if
strangers applied for them to satisfy himself they were
not persons who might do violence to the defendant.
The court has no knowledge that while the tickets were
not exhausted any person was refused one. The ticket
system prevented disorder in the corridors of the court-
house."

In the case of People v. Murray, 14 L. R. A., 405,
relied on by counsel for appellant, the order of the trial
court to the police officer was to "stand at the door and
see that the room is not overcrowded, but that all re-
spectable citizens be admitted, and have an opportunity
to get in whenever they should apply."

The Supreme Court (Michigan) said: "It is shown be-
yond question that during the whole trial the court-
room was not overcrowded, nor were the seats provided
for spectators occupied to any great extent. This
officer was under the control of the court, and when the
court was informed that he was excluding citizens and
taxpayers, he refused to take any notice of the com-
plaint, and left the officer to exercise his discretion as
to what respectable citizens he should admit."

It is not pretended that any such exclusion or dis-crimination was practiced in this case.   Had the court adopted the suggestion contained in the motion of appellant's counsel, and directed the officer to admit all *"respectable* persons," then the vigorous language of the case cited, denouncing the plan as violative of the con-stitutional right of "public trial," would have been applicable here; for, as indicated in that case, no citizen is required to present to a police or other officer a cer-tificate of respectability before he is entitled to attend a public trial, as demanded by the Constitution of his country.

Counsel next discusses the alleged errors of the court in admitting and excluding testimony.   These are quite numerous, and, while all have been examined carefully, only the more important seem to demand special comment.

It is to be remembered in this connection that the true solution of this mysterious case rests largely not upon direct testimony explaining the immediate trans-action, but upon circumstances affecting or supposed to affect the main transaction; so that, as said by this court in the O'Brien case (89 Ky., 362), "the evidence should be allowed to take a wide range, otherwise the guilty would often go unpunished.   It is true there must be some connection between the fact to be proven and the circumstances offered in support of it; yet any fact which is necessary to introduce to explain another, or which afforded an opportunity for any transaction which is in issue, or shows facilities or motives for the

commission of the crime, may be proven.    Even evi-
dence tending to prove a distinct offense is, therefore,
admissible if it shows facilities or motives for the com-
mission of the one in question.    The purpose," says the
court, "is to weave a net about the guilty, and often this
can no more be done by proof of a single circumstance
than the building of a house with a single brick."

This language is particularly applicable to the first
complaint of counsel on this subject.

The autopsy held by the coroner developed that he
found a healthy foetus, which must have been alive up
to the time of the mother's death.    This is claimed to be
error because no mention is made of the murder of an
unborn child in the indictment.    We think the exist-
ence of the foetus conduces to furnish a motive for the
killing; its age would show the necessity for immediate
action if relief was to be afforded or concealment made
longer possible.    Moreover, it appears that where
death is caused by hemorrhage, there is less flow of
blood in cases where the subject is pregnant, owing to
the mysterious effort of nature to maintain the life of
the foetus; and this question of the quantity of blood
found about the body affects the very jurisdiction of
the court trying the case, as upon it depends chiefly the
solution of the question whether the decapitation oc-
curred during life, and at the spot where the body was
found.

Serious complaint is urged against the competency
of Mayor Caldwell's testimony to the extent particu-
larly that the witness gave any conversation between

Jackson and Walling after their arrest. The point of the objection can be understood the better by quoting from the bill of evidence.

"*A.*—Mr. Jackson was asked about the satchel, and he said he had left the satchel at Mr. Legner's saloon across the street from where he roomed. When asked why he brought that satchel out he said he wanted to loan it to a young doctor, whose name I do not remember, and he intended taking it to the college to give it to him, but he did not give it to him, and finally admitted that it was Pearl Bryan's satchel. Walling then repeated, . . . 'I want to say in the meantime, in one of these conversations, we had told both these young men that they did not have to make any confessions to any person; that they were at perfect liberty to refuse to answer any and all questions that were asked them.' . . . Walling then stated in his presence that when Mr. Jackson came back from his holiday vacation he took him into the corner of his room on Ninth street, where they roomed, and told him that he was in trouble with Pearl Bryan, and that he intended to kill her. When asked how, he says: 'I propose to get a room, take her to the room and give her some quick poison and leave her there.' Then again, he says, he changed, and said; 'No, I will cut her up into pieces and take the pieces and deposit them in different places about the city.' On this evening he said that he saw Pearl Bryan at the postoffice, and I believe that was Thursday evening instead of Wednesday evening. He

said that Jackson had made arrangements to take her over to Bellevue (I think it was) or over at the sand-bar or some place and then kill her, take her head off and bury her. He said that Jackson asked of the physicians as to the effects of the different kinds of poisons and that he had a standard medical dictionary in his room studying the effects of poisons, and that he asked one physician particularly as to the effects of cocaine, and he said that Jackson went to Sixth street to a pharmacist and got cocaine, and he brought it back and he said there was a level teaspoonful—a small teaspoonful as he described it; that he poured it out and dissolved it in two teaspoonfuls of water and put it in a bottle, as he said, to give her to paralyze her vocal organs or throat, and then cut her head off. Jackson turned to 'Wally', as he called him at this time, and he says: 'Wally, why do you talk that way? You know you are not telling the truth; you know that you killed Pearl Bryan,' whereupon Walling says: 'No, you know that you killed her, and why don't you tell where her head is?' Then, when Jackson was asked where Pearl Bryan's head was, he says, 'I don't know; Wally says he threw it overboard.' Then he (Jackson) said that they took her clothes and made one or two trips, I don't remember, to the river, and threw part of them over into the river and some into the sewers, but he could not tell where. Mr. Jackson then said that there was a bundle that he had given Walling; that Walling had a bundle and asked him what he did with it Walling says that bundle is up in my locker at the college. The bundle

was sent for and brought into their presence, and it was a pair of pantaloons which Jackson identified as his, but said that he hadn't seen them for some time; that Walling must have worn them, and thereupon I asked them then as to where the other clothes were, whereupon Walling says: 'Jackson, why don't you tell him where those things are; you might just as well do it now as any time?' Whereupon Jackson said that on the Saturday, I believe it was, that they were walking up Plum street with the bundles, that they met there some young physician or dental student coming toward them in an opposite direction, when they changed around and went down Plum and out Ninth. Jackson, as he said, went in little Richmond street, and emerged from that, after the other man had passed, and came back down Plum to Ninth, from Ninth to Richmond, and out Richmond street westward, where he threw the bundle in one of the manholes or sewers, but he could not state which. The sewers were drained or searched and the bundle brought to the department and Mr. Jackson identified it as his coat, first denying that it was his; said it was Walling's, but afterwards admitted that it was his coat; but that Walling must have worn it. There were several conversations of this character, one time Walling accusing Jackson of killing the girl, then Jackson accusing Walling of killing her."

It is altogether clear that the statements of both Jackson and Walling were made voluntarily and are free from the suspicion of having been procured by promises or threats. It follows, therefore, indisputably

that Jackson's statements are competent. These, however, without the corresponding portions of the conversation, as made up by Walling's statements, would be unintelligible. The whole must be taken in order to get the sense of it.

Here Walling discloses where a bundle is—a bloody coat—and it is found where he locates it. Jackson also tells where a bundle is—a pair of pantaloons, muddy and bloody —and the bundle is found where he locates it. There is no confession by either party, and no admission of any fact intended to be inculpatory. The conversation was voluntarily entered into by each party to it, and we think the whole of it was competent; but on the following day the court said to the jury: "When upon yesterday I permitted Judge Caldwell to detail to you what Walling had stated concerning the conduct and statements of Jackson to him in Jackson's presence, it was done and admitted to you as testimony in this case for the sole purpose of your determining from what Jackson said, or his conduct at the time, in Judge Caldwell's presence, whether he admitted or denied the statements made by Walling, and you will determine, from all the testimony you hear in this case, whether or not Jackson, by his conduct, expressly or impliedly admitted or denied what Walling said."

We are not satisfied that it was proper to thus limit this testimony. On the contrary, it would seem that those portions of Walling's statements which Jackson did not deny, or, in other words, remained silent about, were the portions which were incompetent, if any were.

This is true because Jackson was not called on, or it was not incumbent on him to speak at all. He had the right to remain silent when charged with the crime, and guilt is not to be imputed to him by reason of that silence.

As we have seen, however, he did not remain silent, but voluntarily entered into the conversation, denying every imputation of guilt. Later on the witness, Crim, was testifying to conversations between Jackson and Walling and the officers, and testified that Walling said that the Saturday before the arrest he met Jackson in Cincinnati with a Penny Post in his hand; that Jackson told him "they had something to work on; that if it were not for those damned shoes we would be all right;" and further said that "I see the detectives have gone to Greencastle, and it looks damned blue." In response to this Jackson answered: "It is not true, and you know it is not true, Walling." Thereupon the court said to the jury: "You are to disregard every statement this witness has detailed that Walling made, which Jackson denied the truth of. I take this occasion now to charge you further that you will do the same as to all the testimony that Judge Caldwell gave as to what Walling said upon this same occasion, to which Jackson answered, 'Walling, you know you are not telling the truth.' All that testimony you will disregard, and will not consider it in coming to a conclusion in this case."

Still later in the trial, and after the defendant had testified minutely as to these conversations and his conduct and manner toward Walling, the witnesses, Cald-

well, Crim, Deitsch and others, were brought back in rebuttal, and were allowed to testify to the manner of Jackson's denial of Walling's statements, the court saying: "The court now tells the jury that for the purpose of rebutting the testimony of Scott Jackson, and for that purpose only, the jury will consider statements made by Chief Deitsch, Mayor Caldwell, Cal Crim, McDermott, Julius Plummer and Mr. Poock, in reference to conversations that they detailed between Walling and Jackson, in the presence of Chief Deitsch and Mayor Caldwell, in reference to what Jackson had said to Walling when in Jackson's room and Jackson's denial of it;" and finally, in a written instruction (No. 13), the court told the jury that "all the evidence offered by the Commonwealth as to any statement of Alonzo Walling, the truth of which the defendant, Scott Jackson, denied, and, as to the manner and language of the denial, are to be considered by them solely in rebutting the defendant's testimony thereto—that is, to contradict, weaken or explain Scott Jackson's statements in reference thereto, and not as testimony upon which to find him guilty. The defendant's own statements of what Alonzo Walling said, and the language and manner of his denial, are before the jury for every purpose."

As in all the conversations Jackson did in fact deny the truth of every charge looking to his guilt made by Walling, the effect of the court's ruling was to exclude from the jury all that Walling said to Jackson's detriment, except as affecting his own statements on the stand with respect thereto. This we have seen was

more favorable to him than he had the right to demand.

We are of the opinion further, in view of the fact that cocaine was found in the stomach of the dead girl, and that the accused had inquired into its effects, that the witness, Cullen, was properly allowed to state the use of this drug in the production of abortion and its effects on the system.

It is insisted that the witness, Poock, was allowed to testify what Jackson said in his presence after his arrest without it being first shown the circumstances surrounding the statement were proper.   It is clear, however, that in no case was any statement of the accused admitted without a full opportunity for a preliminary examination and until the court was satisfied that the statement was voluntarily made.

Complaint is also made that questions intimating other acts of doubtful propriety on the part of Jackson, and touching matters wholly foreign to the trial were, allowed to be asked.   Objection to these, however, was sustained and counsel cautioned not to indulge in such conduct further.

We think, too, that the various acts of Walling during the week preceding the death of the girl and after her arrival in Cincinnati were properly shown by the proof of Rogers, Martin, Skidmore and others.   These acts were "single bricks in the building," and Jackson was shown to have been closely connected with them. So, too, we think competent the conversation between Jackson and Walling when confined in the "sensitive" cell.   The talk was wholly voluntary.   Nor do we

think incompetent the testimony of the negro witnesses who were introduced in person by the State after their depositions taken for the defense had been read.    The jury heard each statement.

Many other rulings of the court touching the admission and rejection of testimony are complained of, but the decision of the court in each case is easily sustained on principles already announced.    The instructions of the court have been examined carefully and need no extended comment.    The first is on the theory that Jackson did the cutting and killing; the second that Walling did this and that Jackson aided and abetted him; the third we quote in full: "If the jury believe from all the evidence beyond a reasonable doubt that the defendant, Scott Jackson, willfully, feloniously and with malice aforethought, himself attempted or aided or abetted or procured another to attempt to kill Pearl Bryan, but she was not thereby killed, and that said Scott Jackson, in this county and State, before the 14th day of February, 1896, though believing said Pearl Bryan was then dead, for whatever purpose, cut her throat with a knife or other sharp instrument so that she did then and there, and because thereof die, they will find said Scott Jackson guilty of murder."

The conclusion is fairly deducible from certain portions of the testimony that an attempt was made to kill the girl by the administration of cocaine while in Cincinnati, and that this was done by the defendant or at his instance, but that she was not thereby killed.    It is to be remembered that, according to the testimony of

Jackson, he did not see the girl in life after Wednesday, and, according to Walling, he did not see her after that day; but the proof conduces to show that they were both with her Friday night when she was in the cab, and that they brought her over to Campbell county.

If she was then dead, as might be supposed from her making no outcry, a verdict of guilty could not have been rendered; but if she was then alive, though appearing to be dead, and by the cutting of her throat she was killed while in Campbell county, then the jury might find a verdict of guilty, although the cutting off of the head was merely for the purpose of destroying the chances for identification or for any other purpose. At last, the instruction does not authorize a verdict of conviction unless Jackson is shown to have cut off the head of his victim in Campbell county—and whilst she was in fact alive—and if he did this, he was guilty of murder, though believing her already dead, if the act succeeded and was but a part of the felonious attempt to kill her in Cincinnati.

Some of the facts on which this instruction is based do not appear as distinctly in proof as others, but there is some basis for the hypothesis put, and the whole arises naturally out of the circumstances in evidence.

The fourth is the same instruction, with Jackson as an abettor and Walling as principal.

The fifth is based on the theory that Jackson feloniously administered, or procured another to administer, drugs to Pearl Bryan, for the purpose of producing an abortion, when she was so far gone with child as to

make it necessarily dangerous to her life, or when the drugs were in themselves, or in the manner of their administration, dangerous to her life; and, though believing her to have been killed in this way, he cut her head off in Campbell county when she was in fact alive, yet he was guilty of murder.

The sixth is identical with the fifth, save that appellant is treated as an abettor and Walling as principal.

Keeping in mind the purpose for which, as appears from the proof, the girl was brought to Cincinnati, the fact that cocaine was found in her stomach and the defendants' inquiries with respect thereto, we think these instructions fairly suggested by the proof and embody correct principles of law.

The seventh and eighth are with reference to voluntary manslaughter, and are not seriously objected to.

The ninth also authorizes a verdict of voluntary manslaughter, and is fashioned after the fifth, with the exception of the words "she *not* being then so far gone with child as to make the same necessarily dangerous, etc.," and the tenth is like the sixth, with the exception of the above words. Our disposition of the fifth and sixth, therefore, disposes of the ninth and tenth.

The eleventh was on the subject of involuntary manslaughter, and authorized such a finding if Jackson cut the throat of Pearl Bryan in Campbell county, under the belief that she was already dead, and did so, not intending to kill her, but merely for the purpose of concealing her identity, unless he had theretofore himself attempted to kill her, or procured another to

Jackson v. Commonwealth.

so attempt, or had administered drugs, or procured
another to do so, for the purpose of producing an abor-
tion, in which event they were to "find as elsewhere in-
structed;" meaning, it is evident, that if the attempt
was to kill her, or if the drugs were administered when
dangerous to her life, he was still guilty of murder, as
theretofore defined, or of voluntary manslaughter, if
the drugs were administered when not dangerous.

The twelfth is the same, except that the accused is
treated as an abettor and Walling as principal.

The thirteenth, we have already seen, is a limitation
on the scope of certain testimony, and is unobjection-
able.

The succeeding instructions are the usual ones on
reasonable doubt, presumption of innocence, etc., and
substantially embrace those asked for by appellant on
these subjects.

Complaint is made that counsel for the State referred
in his argument to the state of public sentiment in the
case, but what was said on this subject was wholly in
response to statements of counsel for the defense on the
same subject, and was presently stopped by the court.

The references to the Webster-Parkman case and to
the Durant case were merely historical allusions to cele-
brated cases of circumstantial evidence, and can not be
said to have been an improper argument or furnish
ground for reversal.

Upon the whole case we are convinced that the ac-
cused has had a fair and impartial trial. If upon his
arrest and when first confronted with the charge of hav-

ing committed so horrid a crime he was so disconcerted —as he might naturally be even if ever so innocent—as to tell an incoherent and contradictory story of his connection with it, yet when time had been given to come to himself he seems not to have availed himself of the opportunity to tell a story at all compatible with that of an innocent man, or even of one who had committed a grave error by inadvertence, ignorance or mistake.

The explanation of his damaging letter to Wood, his claim of utter ignorance of the whereabouts of Pearl Bryan after Wednesday, and his claim of failure to even inquire where she was or what success had attended the plan for her relief, his reasons for disposing of the satchel and other effects of the dead girl, are all improbable stories, and it is not to be wondered at that the jury could not accept his statements as true.

The judgment must be affirmed.

The court delivered the following response to petition for rehearing February 13, 1897:

With great earnestness, force and plausibility two contentions are made by the petitions for rehearing in this case and in the case of Walling v. Commonwealth:

1st. That no facts which occurred in the foreign jurisdiction of Ohio can be tacked on to facts which occurred in Kentucky for the purpose of supplying the elements necessary to constitute the crime of murder in Kentucky.

2d. (And this appears to be the point chiefly relied on) That in giving its instructions to the jury the trial court is not authorized to refer to any fact which oc-

curred in the foreign jurisdiction.   Other suggestions are made in the petitions, but in our judgment do not require specific response.

These two contentions may be considered together, as the first is necessarily raised and considered in the decision of the second, and so treated in the petition.

Reduced to its lowest terms, the claim of counsel is that an attempt to commit a murder in another State, supposed by the guilty party to have been there successful, but in reality completed in this State, though by an act not by him believed to be the consummation of his purpose, is not in this State punishable.

Such is not nor should it be the law.   By the law of this State a crime is punishable in the jurisdiction in which it has effect.   Statutes in numbers have been passed by the general assembly of this Commonwealth providing that jurisdiction should be had of crimes in the county in which the crime became effectual. (Chapter 36, article 2, Kentucky Statutes.)   Such we believe to have been the common law before such enactments.

Assuming that what the jury found was true, in what State or district could the crime be punished?   If not here, where?   If we concede the claims of counsel for appellants no serious crime was committed in Ohio. Nothing was there done but an ineffective attempt to murder.   None was committed here.·  What was done in this jurisdiction was only the mutilation of a supposed corpse, and yet the fact, established by overwhelming testimony, remains that the crime has been

committed. Not all the refinements of counsel can lead us from the conclusion that, when a crime has been completed the result of which is a death in this Commonwealth, we can take jurisdiction of the offense.

Not for a moment can we admit as law the logical conclusion of counsel's argument, namely, that there is a variety of murder, which, by reason of error in its commission, is not anywhere in any jurisdiction punishable; not in Ohio, for the reason that the attempt there made was not successful; not in Kentucky, for the reason that the act there done, and which accomplished and completed the actual killing, was done upon the supposition that the murder had already been accomplished.

One reliance of the defense upon petition for rehearing is that the indictment charges murder by cutting the throat or decapitation, and that the instructions permit and require the jury to consider a previous attempt to kill in a foreign State and by different means. But in our opinion it was not error in the instructions to present to the jury evidential facts which, if found to be true, showed the criminal nature of the act by which the offense was completed.

We see no good reason why we should not consider the motive which inspired an attempted crime in another sovereignty, and the circumstances of the attempt, with the view to determine the character, criminal or not, of the ultimate fact which took place in this sovereignty; nor is such a determination an invasion of the constitutional right of the accused to a speedy "public trial by an impartial jury of the vicinage."

For the accused himself selected the vicinage in which the final act occurred, and thus himself gave jurisdiction to the court which determined the criminal character of that act. Nor can we consider as serious the contention that the ruling of the trial court, approved by the opinion in this case, is punishment in Kentucky of an offense committed in another jurisdiction, and there again punishable, so as to come within the constitutional inhibition against a citizen being twice put in jeopardy. On counsel's own contention no completed crime existed in Ohio, and the crime committed, if punishable under this State's law, can not further or again be punished there.

The objections made to the ticket system of admission to the courtroom during the trial are also insisted on in the petition for rehearing. It is objected that it was impossible for any friend of the appellant to be present during the trial, and that, therefore, the appellant was denied an open public trial; but it has not been attempted to be shown that any friend of the appellant in either case was excluded from the courtroom.

With regard to the objections to the accusatory statements of Walling, made in the presence of Mayor Caldwell, we need only say that they were excluded from the consideration of the jury, except in so far as they tended to contradict, weaken or explain Jackson's own statements in regard to the same conversation.

We have carefully examined the immense mass of testimony in the case, and see no error to the prejudice of any substantial right of the appellant.

The petition for rehearing is overruled.