## MOORE *v*. THE STATE.

1. Where on the trial of one accused of rape it is made to appear to the court that the female alleged to have been raped, on account of her youth and highly nervous condition, is unable to give her testimony before a crowd of spectators, and that the due administration of justice is thereby impeded, the trial judge may clear the court-room, during the examination of the female, of all persons except court officials, the jurors on the panel, the defendant, his counsel, his father, brother, and two sisters, the prosecutrix, her counsel, relatives of the prosecutrix, disinterested members of the bar, and representatives of the press, without infringing upon defendant's right to a public trial, as guaranteed by article 1, section 1, paragraph 5, of the constitution of this State, or without violating the defendant's right to due process of law as guaranteed by the 14th amendment to the constitution of the United States.

(a) Civil Code § 5885, which provides. "During the trials in the superior courts, and all other courts and trials occurring in this State, of any case of seduction or divorce, or other case where the evidence is vulgar and obscene, or relates to the improper acts of the sexes, and tends to debauch the morals of the young. the presiding judge shall have the right, in his discretion and on his own motion, or on motion of plaintiffs or defendants or their attorneys, to hear and try the said case after clearing the court-room of all or any portion of the audience," as construed and applied by the trial judge in the case at bar, is not violative of article 1, section 1, paragraph 5, of the constitution of this State, which declares that "Every person charged with an offense against the laws of this State . . shall have a public . . trial."

(b) The provision of the fifth amendment to the constitution of the United States, which declares that "No person shall be deprived of life, liberty, or property, without due process of law," and the provision of the sixth amendment to that constitution, which declares that "In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed," etc., refer to

powers exercised by the government of the United States, and not to those of the individual States.

2. The objection to the evidence of the female alleged to have been raped, that she did not indirectly consent to sexual intercourse, the objection being that the witness can not draw a conclusion without stating the facts upon which the same is based, is without merit where it appears that the witness had already stated the facts fully upon which her statement was based.

3. More elaborate instructions, if desired, on the question of consent, should have been specifically requested, in view of the general charge and the defendant's contention that he did not have carnal knowledge of the female alleged to have been raped, either with or without her consent.

4. After the defendant has made his statement and rested his case, the admission of evidence not in rebuttal of defendant's statement is a matter in the sound discretion of the court.

(a) The evidence examined and held to be in rebuttal of the defendant's statement.

5. Where a charge of an offense of graver character includes (without additional averment) a minor offense, it is the duty of the trial judge to instruct the jury upon the law applicable to the lesser offense, where the evidence, under any view thereof, will authorize a conviction of the lesser offense. Where, however, the evidence, if credible, proves the completed offense as charged in the indictment, the failure of the judge, without appropriate request, to instruct the jury upon the law applicable to the lesser offense is not cause for new trial, though the jury would have been authorized to convict of the lesser offense in view of the defendant's statement.

(a) The evidence examined and held to prove, if credible, the offense of rape as charged in the indictment, and sufficient, in connection with other evidence in the record, to support the verdict.

No. 2286. JUNE 18, 1921.

Indictment for rape. Before Judge Summerall. Glynn superior court. October 7, 1920.

*Isaac & Isaac, J. R. Thomas,* and *Wilson & Bennett,* for plaintiff in error.

*R. A. Denny, attorney-general, Alvin V. Sellers, solicitor-general, Graham Wright, F. M. Scarlett Jr.,* and *J. T. Colson,* contra.

GEORGE, J. The defendant was indicted for the offense of rape at the May term, 1920, of Glynn superior court. He was put upon his trial on July 21, 1920, at the May adjourned term, and the jury returned a verdict finding him guilty of the offense of rape, with a recommendation to mercy, fixing the penalty at from ten to twenty years in the penitentiary. The defendant filed a motion for new trial, which was overruled, and he excepted. The female alleged to have been raped did not formally appear as prosecutrix, but for convenience she will be so referred to. The prosecutrix was sixteen years of age on January 27, 1920, before the commis-

sion of the alleged crime on March 31, 1920. She was about five feet in height, and weighed only one hundred pounds. For some time she had been employed as cashier in a retail drug-store, and was usually on duty until ten o'clock in the evenings. She had met the defendant at the home of a friend, a few days before the night of March 31, 1920. The conduct of the defendant on this occasion was entirely proper. On a few occasions thereafter he spoke to her pleasantly in the drug-store. On the night of March 31, 1920, he drove his automobile to the drug-store and asked the prosecutrix if he might drive her home. She accepted the invitation, and at ten o'clock he returned for her. Instead of driving directly to prosecutrix's home, the defendant took her around what is known as "the Boulevard." On the drive he requested her to remove her gloves, and she removed the glove from the hand nearer the defendant. He attempted to hold her hand, and she objected. At a point on the roadway he stopped the automobile, threw his arms around the prosecutrix, and, according to her testimony, had sexual intercourse with her, forcibly and against her will. The defendant then drove the prosecutrix to her home. They reached home about fifteen minutes to eleven o'clock. Prosecutrix's mother met her at the door, and asked where she had been. She replied that she did not know, and the defendant made a like reply. The prosecutrix said to her mother, " Mother, this is Mr. Moore," calling the defendant by his name, but not intending (as prosecutrix contended), to introduce the defendant. He shook hands with the mother and bade the prosecutrix good-bye with the statement that he would see her the next day. Just as the mother closed the door, the prosecutrix said to her, " Mother he has ruined me." The prosecutrix's father was not at the time at home, although she had stated to the defendant that her father was at home, and that if she told him what had happened he would kill the defendant. Her father returned home at eleven o'clock, and the family physician was immediately called to administer to the prosecutrix. The physician testified that he saw the prosecutrix within an hour or two after the commission of the alleged offense, and that he found an abrasion on her knee, a torn or ruptured hymen, oozing of blood, bruised mucous membrane, and that there was blood and a starchy fluid having the appearance of semen on her underclothes. The blood upon the prosecutrix's clothes was not caused by menstrual dis-

charges, according to the testimony of the physician, the prose-
cutrix, and the mother. The defendant rested his case upon his
statement. He said that he took the prosecutrix to ride; that she
put her arm around him in the car; that he kissed her and pinched
her thigh without objection from her; and that he suggested sexual
intercourse, but that she stated to him that if she should consent
he would not speak to her again. Whereupon, according to the
defendant's statement, he replied that if she believed him to be
that kind of a man he would take her home. He denied having
sexual intercourse with the prosecutrix either with or against her
consent. He also stated that when she reached home she formally
introduced him to the mother, and that he engaged in conversation
with the mother and the prosecutrix, finally bidding the prosecutrix
good-bye with the statement that he would see her the following
morning, and that he did in fact drive by her home early the next
morning, and saw and spoke to her. The foregoing are the main
facts in the case; but the evidence of the prosecutrix relating to the
conduct of the defendant at the time of the alleged assault upon
her, and the nature, character, and extent of the assault and in-
jury to her person, will be set out more at length in the con-
sideration of the special assignments of error.

1. After the jury was empaneled, special counsel for the pros-
ecution moved that the court-room be cleared of all parties except
officers of court, bailiffs, constables, and parties directly interested,
at least during the taking of the testimony of the prosecutrix and
possibly of her mother. In making the motion counsel stated, "We
are making this request due to the extreme youth of this young
woman, and our information both from her people and physicians
as to her extremely nervous state; and we deem it almost essen-
tial, in order that she may go through this investigation, that the
public be excused." To this motion counsel for the defendant ob-
jected, upon the ground that the defendant was entitled to a fair
and public trial under the constitution, but stated that they had no
objection to the exclusion from the court-room of minors and fe-
males not connected with the case. The court ruled that he would
clear the court-room of every person except " officers of court and
parties at interest." All persons, except " the officers of court, de-
fendant's father and two sisters, one brother, the jury trying said
case and the members of the bar, relatives of the prosecutrix, and

newspaper reporters," were thereupon excluded, by direction of the court, from the room during the taking of the testimony. To this order and ruling of the court the defendant excepted, upon the grounds: (1) that the court acted arbitrarily, without hearing evidence concerning the age and condition of the prosecutrix, and the nature and character of the evidence to be given upon the trial; and (2) that the order of the court was too sweeping, and deprived the defendant of a public trial, as guaranteed him by the constitution of the United States and the constitution of Georgia. Particular reference is made to the fifth amendment to the constitution of the United States, which provides, among other things, that no person shall be deprived of "life, liberty, or property, without due process of law;" to the sixth amendment to the constitution of the United States, which provides, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed;" to the fourteenth amendment of the constitution of the United States, which provides that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws;" and to article 1, section 1, paragraph 5, of the constitution of the State of Georgia, which provides that "Every person charged with an offense against the laws of this State . . shall have a public and speedy trial by an impartial jury." In this connection section 5885 of the Civil Code of 1910, which reads as follows: "During the trials in the superior courts, and all other courts and trials occurring in this State, of any case of seduction or divorce, or other case where the evidence is vulgar and obscene, or relates to the improper acts of the sexes, and tends to debauch the morals of the young, the presiding judge shall have the right, in his discretion and on his own motion, or on motion of plaintiffs or defendants or their attorneys, to hear and try the said case after clearing the court-room of all or any portion of the audience," is declared to be unconstitutional because violative of the provisions contained in the sixth amendment to the constitution of the United States and to the provision of the constitution of this State, quoted above.

The provisions of the fifth and sixth amendments to the constitution of the United States do not affect the case. It is settled that the first ten amendments to that constitution refer to powers exercised by the government of the United States, and not to those of the individual States. *Loeb* v. *Jennings,* 133 *Ga.* 796 (3), 801 (67 S. E. 101, 18 Ann. Cas. 376), and cases cited in the opinion. Nor is the case affected by the due-process clause contained in the fourteenth amendment to the constitution of the United States. See *Loeb* v. *Jennings,* supra, headnotes 6, 7, and corresponding divisions of the opinion. Although we are of the opinion that no Federal question is involved in the case, we hold that the act and order of the court in excluding the spectators as complained of in this case is not violative of the due-process clause (14th amendment) of the constitution of the United States. Provisions respecting a public trial, similar to that of our constitution above quoted, are found in the Federal constitution, as we have seen, and in the constitutions of the States, with the exception of New York, so far as we are advised. It was said by Spear, J., in the case of State *v.* Hensley, 75 O. St. 255 (79 N. E. 462, 9 L. R. A. (N. S.) 277, 116 Am. St. R. 734, 9 Ann. Cas. 111), that " the necessity for such provisions arose from the flagrant abuses which disgraced some of the courts of England prior to our American Revolution." Reference to the Court of Star Chamber is generally made, though it would seem that the secrecy of the trial in the Court of Star Chamber was not the primary cause which led to its abolition by the Long Parliament in 1641. 16 Charles I, c. 10. The name, origin, and jurisdiction of this court are involved in more or less obscurity. It is certain that it was an ancient high court exercising wide civil and criminal jurisdiction. It consisted of the king's privy counsel sitting as a court only, with the addition of certain judges. It sat without the intervention of a jury. It could proceed on mere rumor. The procedure adopted was that of the courts of chancery. Though at one time highly regarded, it finally resorted to the practices of the Spanish Inquisition, and could and did administer torture. It is doubtless true that some of the trials in this court were conducted in secret. It is certain that the accused was not entitled to a jury; that he was not entitled to know his accuser; that he was not entitled to be confronted with the witnesses against him, because the witnesses were examined by in-

terrogatories, as was the practice in the chancery courts, and not in person in open court. Exercising the prerogative of the crown it could define and punish offenses (including political and press offenses) not recognized by the common law. See 1 Holdsworth's (W. S.) History of English Law, 271 et seq., Jenks' Short History of English Law, 166 et seq. Be this as it may, provisions respecting a public trial, similar to that of our constitution quoted above, were undoubtedly made to protect the rights of persons accused of crime. No universal rule applicable to all situations has, however, been stated. It is said in Cooley's Constitutional Limitations (6th ed.), 379: " It is also requisite that the trial be public. By this is not meant that every person shall in all cases be permitted to attend criminal trials; because there are many cases where, from the character of the charge and the nature of the evidence by which it is to be supported, the motives to attend the trial on the part of a portion of the community would be of the worst character, and where a regard to public morals and public decency would require that at least the young be excluded from hearing and witnessing the evidence of human depravity which the trial must necessarily bring to light. The requirement of a public trial is necessarily for the benefit of the accused, that the public may see that he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions; and the requirement is fairly observed if, without partiality or favoritism, a reasonable proportion of the public is permitted to attend, notwithstanding that those persons whose presence could be of no service to the accused, and who would only be drawn thither by a prurient curiosity, are excluded altogether." In *Myers* v. *State,* 97 *Ga.* 76 (5), 77 (25 S. E. 252), it was held: " While every person accused of crime is entitled to a public trial, it is not necessary to its legality that a great multitude should be in attendance, and the presiding judge should not permit the bar or courtroom to become so crowded as to impede the progress of the trial by rendering it difficult for the jurors to enter or leave the box, or by preventing the free movement of counsel and witnesses; moreover, the jury should not be in such close and constant contact with the audience as that remarks of bystanders as to the guilt or innocence of the accused, or other indications of public feeling for

or against him, may reach their ears or come under their observation. The bar at least should at all times be kept sufficiently open and clear for the prompt and orderly dispatch of the business of the court." The exception there considered was not taken to the action of the judge in excluding the spectators who overcrowded the court-room, but to his refusal to exclude them.

In *Tilton* v. *State*, 5 *Ga. App.* 59 (62 S. E. 651), it was held: "Every person accused of crime is entitled to a public trial. The presiding judge, in the exercise of a sound discretion, may, without violating this right, exclude from the court-room during the trial, for any sufficient special reason, such portion of the spectators as fall within the class to which the reason applies. However, where the judge, without further reason than that the testimony will relate to matters ordinarily indecent to be mentioned, orders, over the objection of the defendant, that 'the court-room be cleared of every one not connected with the case,' he abuses his discretion and violates the defendant's right to a public trial. Prejudice to the defendant is conclusively to be presumed from such an order, and a new trial necessarily results." In the opinion, by Judge Powell, section 5885 of the Civil Code is quoted, but it is pointed out that no attack upon the constitutionality of the statute was made. The whole question for decision in that case was, "Did the judge abuse his discretion?" The conclusion reached by the Court of Appeals, broadly stated, is that the accused may insist upon the trial being absolutely open and public except in so far as there is some sufficient reason for excluding certain persons or classes of persons. Judge Powell cites and discusses a number of cases from other jurisdictions. Among the cases cited is that of State v. Hensley, supra. That was a rape case, and the trial judge, in view of the testimony to be given by witnesses, continued the trial during the taking of the testimony in a small court-room to which no one was admitted except the jury, defendant's counsel, members of the bar, newspaper reporters, and one witness for the defendant. It was held that the order of the court exceeded its power in the premises, and that the enforcement of the order was a denial to the defendant of his constitutional right to a public trial. Other cases cited in the opinion in the *Tilton* case, supporting in principle the ruling made in State v. Hensley, supra, are: People v. Hartman, 103

Cal. 242 (37 Pac. 153, 42 Am. St. R. 108) ; People v. Murray, 89 Mich. 276 (50 N. W. 595, 14 L. R. A. 809, 28 Am. St. R. 294) ; People v. Yeager, 113 Mich. 228 (71 N. W. 491). In the case last cited the Michigan statute, allowing the judge in certain cases to exclude from the court-room " every person except those necessarily in attendance," was held to be unconstitutional as applied to a criminal case. The cases cited to the contrary are: Grimmett v. State, 22 Tex. App. 36 (2 S. W. 631, 58 Am. R. 630) — a rape case, where the spectators, during the taking of the testimony of a female, became so boisterous with laughter as to interfere with the court and to confuse the witness, attorneys not connected with the case and jurors not on the panel being allowed to remain; People v. Kerrigan, 73 Cal. 222 (14 Pac. 849) — where the defendant became unmanageable and began to use profane and abusive language to the judge and officers of the court, so . that the trial could not proceed until the spectators were excluded; Stone v. People, 3 Ill. 326 — where, on account of noise and confusion on the outside of the court-room, the judge ordered the doors to the court-room locked, but directed that the officers permit any one to pass and repass who wished to do so ; Lide v. State, 133 Ala. 63 (31 So. 953) — where the spectators began to applaud the argument of State's counsel; State v. 'McCool, 34 Kans. 617 (9 Pac. 745) — where all females were excluded from the court-room, upon the statement of one of the attorneys in the case that he was about to refer to certain evidence which could not be discussed in their presence; State v. Brooks, 92 Mo. 542 (5 S. W. 257) ; Jackson v. Commonwealth, 100 Ky. 239 (38 S. W. 422, 66 Am. St. R. 336 — where it was held that the size of the crowd might properly be limited to the seating capacity of the court-room; U. S. v. Buck, 4 Phila. 169 (Fed. Cas. 14,680) — where it was held that dangerous persons who would be likely to interfere with the due administration of justice might be excluded from the court-room; and State v. Callahan, 100 Minn. 63 (110 N. W. 342) — where the prosecutrix in a rape case, after long and public examination, became so embarrassed by the presence of the crowd that the judge ordered the spectators to leave the room temporarily. By a divided court this was held to be no abuse of discretion and no denial of the constitutional right to a public trial. In the case last cited, Lewis,

J., who delivered the opinion of the majority, after reviewing the case, said: " Applying these principles and conceding that a sweeping and unlimited order clearing the court-room throughout the trial would be error, we are of the opinion that it affirmatively appears from the record that the prosecutrix was seriously embarrassed by the presence of a crowd of spectators, and that by reason of the situation the court and county attorney were unable to elicit from the witness such clear and definite statement of the facts as seemed necessary in such a case. We think it fairly appears from the record that the situation was a temporary one, and that the order was made simply to relieve the condition with reference to that particular witness; and while the record does not expressly show that the order was thereafter rescinded, limited, or modified, yet the fair inference from what transpired is that it was not enforced when not necessary. Such being the state of the record, we hold that there was no interference with defendant's constitutional right to a public trial." In the recent case of Davis v. U. S., 247 Fed. 394 (159 C. C. A. 448, L. R. A. 1918C, 1164), it was held that an order of the court directing that the court-room be cleared of all spectators, excepting relatives of the defendant, members of the bar, and newspaper reporters, deprived the defendants of a public trial, as guaranteed by the 6th amendment to the constitution of the United States. In that case the crime for which the defendants were indicted had connection with a train robbery, and the trial which was held at Muscogee, Okla., excited more than ordinary interest. At previous sessions the court-room was crowded with spectators, and the court had found it necessary to direct the bailiffs to clear the aisles so that witnesses would not be impeded when called. Ill feeling had developed between defendants, their relatives and friends, and some of the witnesses for the prosecution; and the court had placed the latter in the care of an officer. On the evening of the night session (when the order to clear the court-room was made) an encounter occurred in a restaurant, in which a relative of one of the defendants hit a witness for the prosecution across the face with a newspaper. This was reported to the court, also that one or more of the witnesses in the court-room was intoxicated. It did not appear, however, that the court-room was crowded beyond its seating capacity when the order to

clear it was made, or that any person was making a disturbance or threatening to do so, or that there was any well-founded apprehension that a disturbance would occur. By the favor of the court officers, about twenty-five people were allowed in the court-room. Two female relatives of the defendant, newspaper men, and about ten members of the bar were also allowed to remain after the giving of the order. Other citizens, against whom no objection appeared on account of character or condition, sought and were denied admission, although there was space in the court-room for the accommodation of such citizens. In the course of the opinion it was said: "As the expression necessarily implies, a public trial is a trial at which the public is free to attend. It is not essential to the right of attendance that a person be a relative of the accused, an attorney, a witness, or a reporter for the press, nor can those classes be taken as the exclusive representatives of the public. Men may have no interest whatever in the trial, except to see how justice is done in the courts of their country. The qualifications of the broad scope of the constitutional provision and of like provisions in the constitutions of the States are few, and are based upon considerations of public morals and peace and good order in the court-rooms."

The constitutional provision guaranteeing the right of public trial is intended to protect persons accused of crime. While the public have the privilege to attend the trial of a criminal case, the purpose of the provision is to secure a right, not to the public, but to the defendant. Manifestly, the State has the right to enforce its laws, and to this end it may enact any needful legislation, having due regard to the constitutional rights of the persons accused, including the right to a public trial. In the case at bar, court officials, the jurors on the panel, the defendant, his counsel, his father, brother and two sisters, the prosecutrix, her counsel, relatives of the prosecutrix, disinterested members of the bar, and representatives of the press were permitted to remain in the court-room during the taking of the testimony of the prosecutrix. While disinterested attorneys and representatives of the press are not the exclusive representatives of the public, it is equally certain that they are not officers of court nor the representatives of the State as against persons accused of crime. The trial of a criminal case, conducted in the presence of the defend-

ant, his relatives, disinterested members of the bar and representatives of the press, can not be said to be a secret trial; and we are of the opinion that section 5885 of the Civil Code, quoted above, as construed and applied by the trial judge in the case at bar, is not violative of article 1, section 1, paragraph 5, of the constitution of this State, which provides that "Every person charged with an offense against the laws of this State . . shall have a public and speedy trial."

It is true that the judge did not require proof of prosecutrix's age, of her condition, or of the nature and character of the testimony to be given. The age and condition of the prosecutrix was perhaps apparent to the trial judge, and he must have known the general nature and character of the evidence to be given. Though the motion to exclude the spectators was based upon special grounds, the court was authorized to act upon any good and sufficient reason apparent to him. We can not say that the reasons upon which the court acted were not sufficient reasons. The court was advised by counsel (and we cannot say that it was not also apparent to the court) that the prosecutrix, on account of her youth and highly nervous condition, would be unable to give her testimony before the large crowd of spectators. In such circumstances the due administration of justice would have been impeded. The order of the judge clearing the court-room of all persons except those named above was not an abuse of discretion.

2. On the trial of the case counsel for the State asked the prosecutrix whether or not she "directly or indirectly consented for this defendant to have sexual intercourse" with her. To the question the prosecutrix answered in the negative. It is contended that the prosecutrix should not have been permitted to give an opinion or to draw a conclusion without stating the facts and circumstances upon which the conclusion was based. Under the facts and circumstances of this case the error, if error at all, in admitting the testimony is not of such gravity as to require the grant of a new trial. From the record it appears that the question was propounded at the conclusion of the direct examination of the prosecutrix. She had detailed the facts and circumstances of the case. After she was permitted to answer the question, she was subjected to a rigid cross-examination, and again went fully into all the facts and circumstances upon which she based her answer.

3. The failure of the court to charge the jury on the question of consent is assigned as error in one ground of the motion for new trial. It will be noted that the defendant denied having sexual intercourse with the prosecutrix, either with or without her consent. The court gave in charge to the jury the definition of rape as contained in the Penal Code (1910), § 93. At one point in his charge he instructed the jury that the burden was upon the State to prove beyond a reasonable doubt that the defendant did unlawfully and with force and arms make an assault upon the prosecutrix and did have carnal knowledge of her " forcibly and against her will." If the defendant desired further instructions on the subject of consent, an appropriate request should have been made.

4. The prosecutrix and her mother were examined in chief, and the State rested its case. After the defendant had concluded his statement, the State was permitted to call the family physician who made an examination of the prosecutrix on the night of the commission of the alleged offense. The testimony of the physician was objected to upon the ground that it was not in rebuttal of anything contained in the defendant's statement. The testimony of the physician is found in the record, and has been referred to already in this opinion. This evidence directly tends to contradict the statement made by the accused. Even if not strictly in rebuttal, the admission of the evidence after the defendant had made his statement and rested his case was a matter in the sound discretion of the court.

5. Finally, it is insisted that the court erred in failing to charge the law of assault and battery. There was no request for such a charge, and the defendant in his statement contended that he did not make an assault of any character upon the prosecutrix. He did, however, admit that he kissed the prosecutrix, and put his hand upon her thigh. The admission was coupled with the distinct statement that no objection to this conduct was made by the prosecutrix. However, it is insisted that the offense of assault and battery is necessarily included in the charge of rape, and that under the evidence the jury was authorized to find the defendant guilty of assault and battery only. This contention is based upon the following testimony of the prosecutrix: " He [the defendant] caught hold of my hand, and I told him he was not going to hold

hands with me. He caught hold of it again, and I took my hand and pulled it back this way, and told him that he would have to take his hand off mine. . . The car was out on the boulevard when he stopped it; it was a dark night; there were no lights around there, there were no people; he said the car stopped. I don't know whether he stopped it or not; it stopped still; he says the car has stopped, and moved over toward me. I thought he was going to get out, but he grabbed my body and tried to kiss me. I was fighting him and moving my head, and done everything I could to keep him from kissing me, he just kept on trying to kiss me, then he pulled me toward him and put his hand under my dress and stuck his finger in me. I started screaming just as loud as I could; the way he had me I could not do a thing; he was right on me where I could not move; after he stuck his finger in me I hardly knew what happened; he had sexual intercourse with me. I remember him trying to wipe the side of my leg off and I told him to take his hand away. . ." On cross-examination the prosecutrix testified: " The first intimation form [the defendant] that he wanted to be rude with me was when he caught hold of my hand and when I told him to turn it loose. . . I did not pay any attention to that, and we went on talking. . . He put his arm around me, his right arm; he was driving just as fast as he could. I told him to take his arm from around me; he said that was all right. When the car stopped he said, ' The car has stopped,' I thought he was going to get out and crank the car. I kept him from kissing me. He got over from behind the steering-wheel and says, ' The car has stopped.' He grabbed me and tried to kiss me, he was kind of leaning over me, before I knew it he was right on top of me; the last I remember I was sitting up in the seat, trying to keep him from kissing me. When he first grabbed me he grabbed me with both arms, around the shoulders. I was frightened; he held me tight; the next thing I knew he had run his hand up me and stuck his finger in me; then he got on top of me. The last I remember I was sitting up. I was almost senseless, but I fought as hard as I could. I screamed continuously. I hollered time he grabbed me. I never got off the front seat. I was in the same position when I came back to my senses. I tried to choke him. . . I could not kick him, but I put my foot over the side door trying

to get out; he was on top of me, and I got upon the seat, and he jerked me back. I tried to get my leg up over the door. I did not try to open the door, because he was on top of me and I could not. . . The last I remember, he grabbed me; just how he had me I don't know; after he stuck his finger in me and got on top of me I don't remember. He put something else in me much larger than his finger. I could not kick him; he was on me. I was fighting him, trying to shove him off. I don't know how long he was on me. I fought all the time. I remember fighting. I shoved at him and fought at him, tried to choke him, did everything I could, tried to get him up from on top of me. . . When he grabbed me and tried to kiss me I was scared to death, and when he ran his hand up under my dress it liked to have scared me to death. I couldn't hardly get my leg over the door. I tried to push him off, but not with my foot. I tried to keep his hand out. I tried to keep my dress down." The mother of the prosecutrix testified that on the night of the commission of the alleged offense, and after the offense was alleged to have been committed, she gave the prosecutrix a douche, using an ordinary syringe. On cross-examination the physician testified that the insertion of the tube might produce a rupture of the hymen, and that the insertion of the finger without cover would have a tendency to cause the same result. It is to be noted, however, that the physician testified to other injuries to the person of the prosecutrix, which in all reasonable probability could not have been produced by either of these means.

It is conceded that a verdict of assault, or of assault and battery, or of assault with intent to commit a rape, may be founded upon an indictment for rape. An assault or assault and battery is necessarily involved in every case of rape. *Speer* v. *State,* 60 *Ga.* 381, 382; *Goldin* v. *State,* 104 *Ga.* 549, 551 (30 S. E. 749); *Watson* v. *State,* 116 *Ga.* 607, 43 S. E. 32, 21 L. R. A. (N. S.)

1. Where a charge of graver character includes a minor offense, if the evidence will justify a verdict finding the defendant guilty of the minor offense, it is the duty of the judge to instruct the jury as to the principles of law applicable thereto. The graver offense must either necessarily include the minor offense, or the indictment must charge the essential elements of the minor offense. To state the rule as strongly as possible, the jury should

in all cases be instructed that the defendant may be convicted of the lesser offense necessarily involved in the graver offense, where the evidence submitted, under any view thereof, will authorize conviction of the lesser grade. *Sutton* v. *State,* 123 *Ga.* 125 (51 S. E. 316). The mere failure of the court to charge the jury on the law of assault and battery, on the trial of one indicted for the offense of rape, is not cause for new trial where the evidence in the case, if credible, proves the crime as alleged in the indictment. These general principles are not denied; but it is insisted that in view of the testimony of the prosecutrix the jury might have concluded that after the defendant had put his hand under her dress and inserted his finger in her private parts, she became unconscious and did not know what actually took place thereafter. While the prosecutrix does say that she " hardly knew " what happened after the defendant placed his hands underneath her clothing, and in effect that she lost consciousness through fright, the only reasonable interpretation of her testimony is that on account of the assault she was not fully conscious of and could not remember all the details of the transaction, or else that she shrank from a recital of them. She testified positively that the defendant had sexual intercourse with her. Though stating that she " hardly " remembered what happened, she positively asserted that she continued her struggles until she was released by the defendant, and described in detail the resistance offered by her until the assault upon her person had ended. The mere failure of the judge to instruct the jury on the law of assault and battery on the trial of one indicted for the crime of rape will not be held to be error requiring the grant of a new trial, upon the theory that the jury may have believed a part and disbelieved a part of the testimony of the prosecutrix. That is to say, the jury are not at liberty to accept the testimony of the prosecutrix that an assault was made upon her person, and at the same time arbitrarily reject her testimony, equally positive, that the defendant had sexual intercourse with her, forcibly and against her will. The case differs from a case of assault with intent to rape. It rarely happens that an assault is accompanied by such overwhelming and conclusive evidence of the intent with which it is committed as to require the jury to find that the assault was made with the intent to commit a rape. This principle is recognized in the *Sut-*

*ton* case, supra. It is conceded that the testimony of the physician may be viewed as tending either to corroborate the evidence of the prosecutrix that the defendant did in fact have sexual intercourse with her, or as tending to support the defendant's theory in the case. The fact that his testimony may be viewed as tending to support the defendant's theory is, however, immaterial. The testimony of every witness except that of the prosecutrix relates merely to the condition of the prosecutrix after the commission of the alleged offense, and does not tend to disprove the statements testified to by the prosecutrix. In deciding whether the failure of the judge to instruct the jury on the law of assault and battery is cause for new trial in this case, the evidence of the prosecutrix alone must be considered. As we have said above, her evidence, if credible, proves the completed offense as charged in the indictment, and, in connection with the other evidence in the case, is sufficient to sustain the verdict. Under the defendant's statement, instructions upon the law of assault and battery would have been appropriate, but there was no request for such instructions.　　　*Judgment affirmed. All the Justices concur, except*

ATKINSON, J., dissenting from the ruling in the fifth headnote and to the corresponding division of the opinion. The evidence for the State was sufficient to authorize a verdict finding the defendant guilty of assault and battery, and did not demand a finding that a rape had been actually committed. It was therefore error to omit, though not requested, to charge the law applicable to a case of assault and battery.