### LEWIS v. THE STATE.

HINES, J.  1.  The charge being rape, and the evidence, if credible, showing conclusively that the carnal connection was complete and that the offense of rape was actually perpetrated, the court did not err in failing to charge the law applicable to assault with intent to commit rape, or assault and battery, or a mere assault.  *Kelsey* v. *State*, 62 *Ga.* 558; *Johnson* v. *State*, 73 *Ga.* 107 (2); *Harris* v. *State*, 101 *Ga.* 530 (29 S. E. 423); *Welborn* v. *State*, 116 *Ga.* 522 (42 S. E. 773); *Canida* v. *State*, 130 *Ga.* 15 (60 S. E. 104); *Moore* v. *State*, 151 *Ga.* 648 (108 S. E. 47).

2.  The evidence of the female alleged to have been raped shows that carnal knowledge of her by the defendant was complete, and was sufficient to have authorized the jury to find that she had been actually raped by the defendant, but did not authorize a finding of a mere assault with intent to commit rape, or a mere assault and battery, or a mere assault. The other evidence introduced on the trial would not have authorized the jury to find that he did not have complete carnal knowledge of the female.  It corroborates and does not contradict the testimony of the female, that such carnal knowledge was complete.  For this reason the court did not err in failing to charge the law applicable to any of the above lesser offenses.

3.  The charge:  "Now, gentlemen, I charge you this principle of law:  The accused could not be convicted upon the woman's testimony alone, however positive it may be, unless corroborated by circumstances," was not error, as contended, on the grounds that it "is inaccurate and misleading; it fails to refer to the testimony of the one assaulted; it fails to explain what circumstances are referred to, and does not explain what circumstances, facts, testimony or evidence will be sufficient corroboration of the facts and evidence given by the one assaulted; that such reference to the 'woman's testimony' is confusing and misleading, because several witnesses who testified for the State were women; and because it does not charge the correct rule of law that the defendant cannot be convicted of rape upon the testimony of the person assaulted alone, unless her testimony is corroborated by other evidence."

4.  There is sufficient evidence to support the verdict.

*Judgment affirmed.  All the Justices concur, except*

ATKINSON, J., dissenting.  Where a charge of an offense of graver character includes (without additional averment) a minor offense, it is the duty of the trial judge to instruct the jury upon the law applicable to the lesser offense, where the evidence, under any view thereof, will authorize a conviction of the lesser offense.  *Moore* v. *State*, 151 *Ga.* 648 (5) (supra).  An indictment which alleges that the defendant did "unlawfully and with force and arms have carnal knowledge of" a named

person, " a female, forcibly and against her will, contrary to the laws,"
etc., charges the offense of rape and includes the minor offenses of
assault with intent to commit a rape, assault and battery, and assault.
*Johnson* v. *State*, 14 *Ga.* 55; *Speer* v. *State*, 60 *Ga.* 381; *Moore* v.
*State*, 151 *Ga.* 648, 662 (supra), and cit. An indictment for assault
with intent to commit a rape may charge that offense in language that
will not include a battery (*Goldin* v. *State*, 104 *Ga.* 549, 30 S. E. 749),
but this does not conflict with the principle stated above. If *all* of the
evidence proves the completed offense of rape as charged in the indict-
ment, such evidence would not support a verdict for the lesser grades
of offense. Penal Code (1910), § 19; *Kelsey* v. *State*, 62 *Ga.* 558;
*Johnson* v. *State*, 73 *Ga.* 107 (2); *Harris* v. *State*, 101 *Ga.* 530; *Wel-
born* v. *State*, 116 *Ga.* 522; *Canida* v. *State*, 130 *Ga.* 15; *Moore* v. *State*,
supra. But where, on the trial of a defendant under an indictment of
the character mentioned above, the evidence of the injured female,
though contradictory, was sufficient to establish the technical offense of
rape, and there was testimony delivered by other persons who were
present at the time it was contended by the alleged injured female that
the crime was committed, which did not support the charge of rape, but
was sufficient to support a verdict for an assault with an intent to com-
mit a rape, or a verdict for assault and battery, or a verdict for a
bare assault, it was erroneous for the judge while instructing the jury
to omit, without request, to charge the law applicable to these minor
grades of offense. In this case the error in omitting to charge the
law relating to the minor grades of offense was sufficient to require
a new trial.

                    No. 3818. NOVEMBER 27, 1923.

Rape.    Before Judge Munro.    Muscogee superior court.    May
19, 1923.

An indictment for the offense of rape charged that A. L. Lewis,
on a stated day in Muscogee County, " did then and there, unlaw-
fully and with force and arms, have carnal knowledge of Mattie
Mae Lewis, a female, forcibly and against her will, contrary to the
laws," etc. The jury returned a verdict finding the defendant
guilty and recommending him to the mercy of the court. The de-
fendant made a motion for a new trial, which being overruled,
he excepted. A substantial statement of the evidence follows.

The defendant and his family moved from another county to
Muscogee County. The defendant and his daughter Mattie Mae,
the alleged injured female, went in advance of the other members
of the family, and became mill employees working at different
mills. After arrival in the county they boarded for a while at one
place and then at another. At the latter place they occupied a
room in which were two beds. Finally a place of abode was ob-
tained in Bibb City, a village in the County of Muscogee, and they

were joined by the other members of the family. The place of abode was one side of a small building, separated from the other side by a partition. The other side of the house was occupied by J. Thomas and his family. Mattie Mae Lewis testified on direct examination that she was seventeen years of age, and substantially as follows: She was sleeping in a bed with her sister Laura, sixteen years of age, in a room adjoining the room of her mother. Her sister Lois, twelve years of age, and other children were sleeping in a different bed in the same room. About two o'clock in the morning the defendant came in his night clothes to witness's bed and had intercourse with her. When he started to leave, witness started to get up, and he returned and knocked a slat out of the bed, and slapped witness because she had waked one of the children by " holloaing to get them to go with " her to wash her nose that was bleeding on account of having been slapped by the defendant. While the intercourse was going on the defendant had his knife in his right hand down by witness's side, and after the intercourse he drew his knife on witness and threatened to kill her if she told any body. She did not holloa, because she was afraid. After the intercourse the defendant remained in the room and " made us get up," and the rest of the night laid in a chair before a fire with his head it witness's lap and his feet in the lap of witness's sister Laura. " The intercourse was without my consent. I permitted him to have intercourse with me because I didn't want no such as that going on, I did not want to be that kind of a girl; that was why. I allowed him to have intercourse because I could not help myself. He did not say anything when he first came to the bed. No threats were made to me until he was done in my bed. The threats were made to me after he had done had intercourse with me. During that time Mama told him, ' Amos, I thought you had stopped that,' and he told her to shut her damn mouth, or something like that. . . That was not the first time he had intercourse with me; when he was boarding with Mrs. Clark's right yonder, he made me sleep in the room with him every night; he made me stay in the room Sundays and all the time right with him. . . At the time the intercourse took place in my house at Bibb City I made an effort to get up, but it didn't do any good. I didn't get up; I could not help myself; he held me there on the bed. He had a knife; I saw it. I felt it just as he laid it down

on the side of my throat. That was just as he finished the inter-course, if you want to know. I had made [an] effort to get up before that time. Every time he would start such as that I would try to get up, and he would not let me. I have not been with any other man since I have been in Muscogee County. I haven't been with a boy. I am seventeen years old, and I have never been with a boy. I have been living in Columbus about five weeks — about seven weeks. We come here first last year in 1921. Stayed at Mrs. Collins. I see Mrs. Collins here to-day. I stayed in Mrs. Collins' room. I stayed with her, but he would carry me off at night and keep me out until after dark and everything; and I told him I was going to tell on him, and everything like that; and he just beat me around, and he said it wouldn't do any good to tell on him, that wouldn't nobody do nothing to him. It was Thurs-day night that this occurred. I reported it Friday morning to Mr. Parker, and Mr. Parker reported it to Mr. Kiser. I told Mr. Kiser myself; that was on Friday; the Friday morning following I reported it to him; the Friday morning, and then that Friday afternoon they arrested him."

On cross-examination witness testified: Yes sir, he threatened if I told it he would cut my throat. He said that between the be-ginning and the ending; that was the way it was. This had been going on for some time, ever since I was fifteen years old. . . I reported his conduct up here to Mrs. Jones; and she told her hus-band and Mr. Jones told Mr. Hartz. When Mr. Kiser came to me I told him all about it. I told Mr. Hartz about it, my boss, first, and he went up there and told Mr. Kiser about me being up there cry-ing. I told him that morning, and he got Mr. Kiser and told me to recite it to him. I did not tell my mother about this last occasion, not until [I] had had him arrested. I had him arrested without telling my mother. I told my sister Laura and Lois. I told Lois there that night at home that he would not get a chance to do me that way any other night. I told Lois and Laura. My father was in the front room then waiting for me to come back where I had been washing my nose. I turned on the light after I went to wash my nose. My mother at the time was sleeping in the adjoining room in the bed. I did not tell her about it at all. I started to make an outcry about it, and he drawed his knife and said he would cut my throat if I holloaed. That wasn't after it

was all over with any such thing. I did not tell Mrs. Thomas; they heard it. They heard the racket in there. Knocking chairs around and us getting up so early in the night and setting up, I reckon. They didn't come around to see anything about it; they didn't tell me anything about it. . . This trouble has been going on with my father since I was fifteen years old, and this is the first time I reported it, because he would not let me go anywhere only when he was right with me. I told my mother about it last year. I didn't tell her exactly, she partly caught up with me with it, and she thought he had stopped such as that, and he moved up — and went up to Macon and he kept me up there, and he come back and went home and raised a fuss and he brought me to Columbus, and I reported it. I don't know that he used a rubber. I don't know what he used. Well, I tell you the fact about it, he left me nasty of course. I never become pregnant. This has been going on for about three years." On redirect examination the witness testified: " I was lying in the bed when my father came, on my side, and he came and pulled me over on my back, and I tried to get up, and he wouldn't let me. I just tried to get up and when I did he put his arms around me and drawed a knife on me and said if I got up or holloaed he would kill me. That was during the time he had intercourse with me, not before or after. He struck me after the light was turned on in my sister's presence. He had hit me lots of times. I didn't report it down in Sumter, because we lived out in the country and he would not let me go anywhere only when he went with me."

Witness recalled testified on direct examination: " The night I said my father first mistreated me in Bibb City, I remember I was lying on my side. Well, I was lying on my side, and he turned me over on my back and then he had intercourse with me. I did resist him. Well, I tried to get away from him and I couldn't. He just taken hold of my body and turned me over. He touched my legs. He taken my knees and straightened me out and made me lay still. At that time I had not seen any weapon in his hand. Well, as I started to tell you, he just forced me to do such, and he has been forcing me to do such since I was fourteen years old; and I ain't telling nothing but the truth, and I don't reckon the truth hurts anybody. I have not consented to having intercourse with him. It was after I said my father mistreated me that Dr.

Cosby examined me. Well, it was done on Thursday, and you all had us to meet the grand jury on Wednesday or Tuesday, I have forgotten. The first time he mistreated me was the year that I was fifteen years old. I went down to the woods with him to get a load of wood; that was the first time, and from then on he just kept it up. Yes sir, this first time there was pain and I had lots of trouble." On cross-examination: "He had intercourse with me in Bibb City. I tried to get up. I did not holloa or say anything. He told me if I holloaed he would cut my throat. No, I did not say that after he got up. I said between the intercourse and the ending, the beginning and the ending. Between it is when he drawed the knife on me. We were already having intercourse when he drew the knife, because I was trying to get up. He did not hold my mouth. I didn't holloa out, yes sir, didn't wake my sister, yes sir. She got up and went to the sink with me after she [he] slapped me. It was all after it was all over with. My sister waked up when he slapped me. Yes sir, she didn't wake up, and I was raising cain to keep father from having sexual intercourse with me. How could I wake her up? I did not wake up my sister. The slat woke her up. I did not have anything to do with the slat falling. He made the slat fall. Yes sir, I was under him; yes, the bed give way. While ago I said a slat fell, but that was part of the bed giving way. The mattress went to the floor. No sir he did not try to hold my mouth. I did not try to holloa. Yes sir, and he was on top of me. Before he had said he would cut me. He said if I holloaed he would cut me. No sir, that was when he started, the beginning and ending. He did not draw the knife until he was in the act. No sir, but he had done it before. No sir, this is not the first time I was ever raped before, father having intercourse with me. It was all the time. I did not tell anybody, because I was out in the country, and he would not let me go nowhere to tell. I could not let Mamma know it that night, because I thought it would part Mamma and Papa. I told my mother in Sumter county. No sir, it did not part them. I have been living at home ever since. . . When father got in bed he just rolled me over and got on top of me. He pulled up the cover. He pulled me over on my back. I just laid there. I couldn't do anything else but just lay there. I did not holloa or say a word because he had the knife on my throat." On redirect examination:

" This was not the first time he ever had intercourse with me under threats. He had done this before. He had threatened to whip me and everything like that, but he had not threatened to kill me like he did this time. I said that night I was going to tell it on him or die, one. That was the way I started in to tell it."

Laura Lewis testified: " Me and Mattie were sleeping together that night. . . I saw Papa in the room that night. When Mattie started holloaing, he holloaed he was going to kill her. He had a knife in his hand. He was on the floor and side of the bed, right side of the bed; that was when I first saw him. I saw him there in the bed. It was on Mattie's side of the bed. I am sixteen. Mattie started holloaing, and he said he was going to kill her. That is all Mattie said. He was outside of the bed then. My father told Mattie to go and wash her nose. Her nose was bleeding. He hit her on the nose with his hand, the light was on at the time; Papa turned it on. I did not hear any noise in the room that night before the light was turned on. The slat fell; it awakened me. My father was in the bed, on Mattie's side. I turned over so I could see him. I was scared; that was about ten o'clock. I got up and stayed up. Papa made us stay up. He laid his head in Mattie's lap and feet in mine. . . I saw Papa with [a] knife that night. He had the knife on Mattie's throat right here. He was on the side of the bed. He told her if she holloaed that he was going to kill her. My little brothers and sisters waked up at that time. Lois waked up. I can't say whether my father got under the cover or not. Mattie talked to me after her nose was bleeding and we got up. We went to the sink. She said she was going to have papa arrested. After we went back to the sink she didn't make any complaint to me about what her father had done or said. She said she was going to have papa arrested for hitting her and mistreating her. She claimed mistreatment; the way papa done her. Q. In what particular? A. Course. By the court: What? Course. What did you say? I said course. By solicitor-general: Do you know the meaning of intercourse? A. Intercourse." On cross-examination: " Papa came in the room about ten o'clock that night. He did not have the light on at first. I heard him when the slat fell out. I didn't see him come in the room. He turned on the light when the slat fell out. He was in the bed when the slat fell out. I was in the bed too. My sister

was in the bed. My papa got up and was standing on the side of the bed, and Mattie started to holloa, and he told her not to. He told her he would kill her if she would tell it. That was the first time he had the knife. I don't know when he got in the bed with Mattie. I don't know what Mattie told him when he got in the bed. I do not know whether she consented to having intercourse with her [him] or not. I did not hear them say anything until the slat fell. Mattie then got up to wash her nose and went into the dining-room. My mother was in the front room at the time. When we got up Mama came into the room. She said he needed killing. She was talking to Mattie. Mattie told my Mamma all about it when she came in the room when the slat fell. I don't know just what she did tell her. We got up and stayed up, until daytime to go to work. After we got up I held papa's feet and Mattie held his head. We were sitting by the fireplace in the chair. Papa had another chair and laid his head in Mattie's lap. There were three chairs in there. . . Mother had to go through the room to go to the kitchen. She came through and saw us all sitting in the chairs together. She did not say nothing at first. She went on into the kitchen and cooked breakfast, and I sat there while she cooked breakfast. Mattie sat there to. I ate breakfast. Mattie ate breakfast too. We went to the mill then. We stayed there until about eight o'clock, when Mattie said something to the boss. Mattie cried. A woman first approached Mattie on the subject. I don't know the woman. The woman asked Mattie what she was crying for. Mattie told her that Papa hit her on the nose and made her sit up. She told her about he had a knife drawed on her. I can't tell it all. She told her about the slat fell, and she told her about that. Told her had course. About in the bed with her. She did not tell him how long he stayed in the bed. She did not tell Mr. Hartz anything. She told Mr. Jones' wife about it. She told a woman, Mr. Jones' wife. Mr. Jones is the boss man. Then she goes ahead and tells Mr. Hartz then, after she told the woman. Mr. Parker been furnishing me with clothes since my papa been arrested. Mr. Parker is police in Bibb City."

Lois Lewis testified: " I am 12 years old. . . The first thing I know anything about — the slat fell out one night and waked me up, and Papa slapped Mattie, and switched on the light, and when I woke up then he was standing at the bedside and had the

knife drawed on her throat, and he slapped Mattie and made her nose bleed, and she got me to go into the sink with her to wash her nose, and she told me all about what he did and how he done it. The first thing that attracted my attention was the slat fell. I could not see my father when the slat fell out of the bed. I heard the lick and happened to look, and he run and switched on the light. Mattie's nose was bleeding. Mattie told me what happened. I am twelve years old. I go to school. My mother was in the other room. Mattie and Laura did not go back to bed; they got up at the fireplace, and Papa laid his head in one of them's lap and his feet in the other. His head in Mattie's lap and his feet in Laura's lap. My father told Mattie he would cut her throat if she told that he was beating on her. That is all I heard."

J. Thomas testified: "It was a single house I live in. Mr. Lewis was living in the other side at the time. . . I remember the time he was arrested. I heard a disturbance on his side of the house the Thursday night before he was arrested on Friday afternoon. . . I heard a fuss in there and some chairs knocking around, . . and I heard Mr. Lewis speak, . . but I could not understand what he was talking about. I heard some chairs knocking, and it seemed like a lick passed, and a chair fell by the side of the wall on the floor. I did not know what it was, but it seemed like it was a chair falling and a lick passed. I heard Mr. Lewis say something to one of the girls in there. He said something or other about a knife — he said something about killing or something or other. I wouldn't be certain; he made a remark about a knife, I know that." On cross-examination: "I heard Mr. Lewis tell some one to shut up that mouth, that he would kill them, and had a knife in his hand. I did not see the knife. He said he had a knife in hand and he would kill — he says, 'I have a knife in my hand, and you had better shut up your mouth.' Or he would kill them. Before he said that, had heard them talking and fussing. . . It seems to me it was . . about ten o'clock when it woke me up; it may be eleven. . . Yes, they got up and set in chairs. I heard them putting the chairs together. . . I heard Mrs. Lewis say two or three words in there. I knew it was her talking. I could not understand what she said."

Dr. Cosby testified: "I examined this girl, . . Mattie May Lewis, in respect to her genital organs; done at the solicitor's re-

quest. I don't remember the date; it has been ten days or two weeks ago. It was after the arrest of Mr. Lewis. Her organs showed every evidence of not being a virgin." On cross-examination: "Well, she was a woman, as well as I could know a thing, who had been cohabited with quite a number of times. . . The vagina was all dilated and in a shape that you would commonly find women who had been cohabited with quite a good deal. I don't know whether it was done by a man, or whether she did it by masturbation, or what process it was done through; but that vagina had been use [used] right frequently for that purpose. . . I could not tell whether it had been recently or not. . Her general indication was that she had been frequently in that condition."

W. B. Kiser testified: "I am chief of police of Bibb City, and employment man. I know Mr. A. L. Lewis. I had occasion to arrest him when his daughter reported the trouble she was having with her father. I don't remember the exact date; it was on Friday. I believe it was Friday. She bore a very troubled appearance, and had been bearing it for sometime. I noticed that her eyes were red and showed sign that she had been crying and was in some trouble, and I sent to her overseer, who is Mr. Hartz, and discussed the matter. She made the complaint to me about noon, and I arrested the defendant after stopping time. . . it was possibly 5:30 when I arrested him."

*J. B. Hoyl*, for plaintiff in error.

*George M. Napier, attorney-general, W. R. Flournoy, solicitor-general, Seward M. Smith, assistant attorney-general,* and *C. F. McLaughlin,* contra.